UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JULIEANN R. SIMONET,

                    Plaintiff,

          v.                                          Case No. 20-C-696

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                    Defendant.

## DECISION AND ORDER REVERSING THE DECISION OF THE COMMISSIONER

Plaintiff Julieann Simonet filed this action for judicial review of a decision by the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff contends that the decision of the administrative law judge (ALJ) is flawed and requires remand. For the reasons that follow, the Commissioner's decision is reversed and remanded.

## BACKGROUND

Plaintiff filed her application for a period of disability and disability insurance benefits on November 8, 2016, alleging disability beginning October 4, 2013. R. 196. She listed carpal tunnel tendonitis in both arms; right shoulder rotator cuff tear; two ruptured discs in her neck; four ruptured discs in her lower back; severe migraines; right side of body nerve damage; numbness, weakness, and dystrophy in her limbs; sciatica–right side; myalgia; cervicalgia; cervical radiculopathy; and depression as the conditions limiting her ability to work. R. 213. After her application was denied initially and upon reconsideration, she requested a hearing before an ALJ.

R. 15. On September 20, 2018, ALJ Chad Gendreau held a hearing at which Plaintiff, who was represented by counsel, Plaintiff's husband, and a vocational expert (VE) testified. R. 36–89.

At the time of the hearing, Plaintiff was 44 years old and living with her husband and two minor daughters in a house in Cedar Grove, Wisconsin. R. 44. Her eldest daughter was in college. *Id.* Plaintiff testified that she completed high school and, prior to her alleged disability, worked at Young Innovations running a bottling line, packaging, and inspecting products. R. 46. She stated that at first she was on her feet all day and could lift 20 to 30 pounds, but by the end of her employment she had been moved to a position where she could "sit down a lot" as needed. R. 47. She reported that she stopped working in October 2013 due to pain in her arm, back, and tailbone. R. 48–49. She testified that she went to physical therapy but could not continue because of "financial issues." R. 53. She also saw a pain management specialist. *Id.* She indicated that she was prescribed Topamax for her migraines but was unable to afford it, so when she has a migraine, she typically takes Excedrin Migraine or lies down in a dark room. R. 57. She also noted that, although Dr. Scarlett referred her to a psychiatrist, she was only able to see the psychiatrist twice because it was not covered by her husband's insurance. *Id.* She testified that she had right carpal tunnel surgery. R. 65.

Plaintiff estimated that she could stand for 15 minutes to a half-hour at a time and could sit for about 15 minutes to an hour. R. 58. She testified that, on her doctor's advice, she tries to walk about a mile per day, which she does in small increments, and on a good day, she can make it around one city block without a break. *Id.* She stated that she wears braces on her hands at night and will sometimes wear them during the day "on bad days." R. 59. She also indicated that she occasionally uses a cane that was given to her by a friend and frequently uses a TENS unit for her arms, neck, and back. *Id.* She testified that she is not able to lift more than about five pounds

Case 2:20-cv-00696-WCG   Filed 09/30/21   Page 2 of 24   Document 33

without pain and that she drops things frequently due to sudden numbness of her hands. *Id.* She further explained that she has difficulty with self-care because of pain, so she will wear the same clothes and go days without showering. R. 60. Plaintiff described that she takes a full day to do a load of laundry and tries to cook dinner every night but leaves the cleaning and shopping largely to her husband and children. R. 60–61. She indicated that when she does do laundry, she takes multiple breaks. R. 62. Plaintiff testified that she does "a lot of laying down throughout the day." R. 68.

Plaintiff's husband, Nicholas Simonet, then testified about his wife's activities. He testified that she can walk a mile with breaks and that, when she does walk, she does so extremely slowly because of the pain. R. 74–75. He stated that she can do simple cooking tasks, like stirring, but cannot open cans, lift more than a few pounds, or lift anything high. R. 75–76. He described that, during family trips, she typically rests or shops while the family does activities, and she cannot tolerate sitting in the car more than about 45 minutes to an hour, so they have to stop frequently on long drives. R. 76–77. He observed that she appeared to be doing better since stopping "all the pain medications," but she sometimes still cries at night. R. 78–79.

In a fifteen-page decision dated February 26, 2019, the ALJ concluded that Plaintiff was not disabled from October 4, 2013, the alleged onset date, through December 31, 2018, her date last insured. R. 15–29. The ALJ followed the five-step sequential evaluation process established by the Social Security Administration (SSA) for determining disability. R. 16. The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018, and that she had not engaged in substantial gainful activity since her alleged onset date of October 4, 2013. R. 17. The ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease, pain in the upper right extremity, depression, and anxiety.

3

R. 18. The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

The ALJ then assessed Plaintiff's RFC:

[T]he claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except the claimant can frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, kneel, crouch, and crawl, and occasionally stoop. The claimant can frequently reach overhead with the left upper extremity, occasionally reach overhead with the right upper extremity, and all other reaching can be done frequently with the left and occasionally with the right. She can handle, finger and feel frequently with the left hand and can handle, finger and feel occasionally with the right hand. The claimant can never work at unprotected heights and can work moving mechanical parts or in vibration occasionally. The claimant is able to perform simple, routine and repetitive tasks, perform simple work-related decisions and interact frequently with supervisors and occasionally with co-workers and the public.

R. 20. The ALJ determined that Plaintiff would be unable to perform any past relevant work as a small products assembler. R. 27–28. But he concluded that, considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, such as polisher, assembler, and order clerk. R. 28–29. Based on that finding, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from her alleged onset date through her date last insured. R. 29. The Appeals Council denied her request to review the ALJ's decision, making that decision the final decision of the Commissioner of Social Security in her case. R. 1.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process,

4

the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Severe and Non-Severe Determinations

Plaintiff asserts that the ALJ failed to consider all of her symptoms in determining whether her left arm impairment was severe. The determination of whether an alleged impairment is severe is essentially a "de minimis" screening device that allows the SSA to increase "the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). If no severe impairments are found, the case ends with a denial of the application. But if the ALJ determines that the claimant has at least one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. In this case, the ALJ found that Plaintiff had severe impairments including degenerative disc disease, pain in the right upper extremity, depression, and anxiety. R. 18. He then continued on with the sequential evaluation to address and evaluate all of Plaintiff's impairments. Accordingly, the ALJ's finding was not insufficient so as to require reversal.

### B. Credibility

Plaintiff asserts that the ALJ's assessment of her symptoms rests on an erroneous evaluation of the record. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment

7

"could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c)(1). In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR 16-3p. "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539. "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester*, 920 F.3d at 510.

Plaintiff asserts that the ALJ applied the wrong standard in assessing her symptoms. She challenges the following statement made in the ALJ's decision: "[A]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the

medical evidence and other evidence in the record for the reasons explained in this decision." R. 586–87. Plaintiff contends that there is no requirement that a claimant's symptoms be "entirely consistent" with the objective and other evidence in the record. Although the ALJ used this "boilerplate language," the ALJ applied the correct standard in assessing Plaintiff's symptoms. Plaintiff asserts that the ALJ failed to indicate in what ways Plaintiff's symptoms are not entirely consistent and that the ALJ failed to address all of the § 404.1529 factors. But § 404.1529 contains a non-exhaustive list of factors, and the ALJ is only required to discuss the factors "pertinent to the evidence of record." *See* SSR 16-3p (noting that not all factors will be "available or relevant in every case"). As explained below, the ALJ discussed the evidence in the record and explained how the substantial evidence supported his decision. *See Harris v. Saul*, 835 F. App'x 881, 886 (7th Cir. 2020); 20 C.F.R. § 404.1529(c); *see also Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that the ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability").

After summarizing the record, the ALJ explained that, although Plaintiff suffered from impairments of the back and right upper extremity as well as mental health conditions, the medical evidence revealed that her impairments have not been progressive. He noted that, while Plaintiff received treatment including pain medication, physical therapy, and injections, she did not receive aggressive treatment for her impairments. R. 23. Plaintiff asserts that the ALJ's reliance on the objective evidence was not a sufficient basis upon which to reject the statements of Plaintiff, her husband, her friend, and Dr. Scarlett. Although an ALJ may not reject a claimant's statements about the intensity and persistence of her pain or other symptoms or about the effect her symptoms have on her ability to work "solely because the available objective evidence does not substantiate [her] statements," 20 C.F.R. § 404.1529(c)(2), this does not mean that an ALJ cannot consider the

9

medical evidence in assessing a claimant's credibility. Indeed, the ALJ is entitled to rely on discrepancies between the objective evidence and statements regarding the claimant's symptoms. *See Schmidt v. Astrue*, 496 F.3d 833, 843–44 (7th Cir. 2007) (finding that ALJ did not err in discounting claimant's reports of pain when they were not supported by the medical record); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

In this case, the ALJ discussed Plaintiff's allegations that she has pain in her back, neck, both arms, and right shoulder and has migraines as well as her assertion that her health problems affected her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, reach, use her hands, remember, complete tasks, and concentrate. R. 21. He also summarized her testimony, including her assertion that she is capable of standing for 15 to 30 minutes, sitting for 15 minutes to an hour, and walking around approximately one city block before needing to rest or sit; that she can lift and carry a gallon of milk with both hands but drops things quite often; that she wears braces on her hands at night and uses a cane; and that she has difficulty with self-care. *Id.* The ALJ concluded that her statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record.

Starting with the objective medical evidence, the ALJ noted that the objective medical findings indicate that Plaintiff was diagnosed with degenerative disc disease in 2010 and that diagnostic imaging in 2010 showed mild multilevel degenerative disc disease with minimal canal narrowing and mild right neural foraminal narrowing. He observed that Plaintiff underwent conservative treatment for her back pain, including activity modification, prescription medications, physical therapy, and epidural steroid injections. Although physical examinations from 2013 to 2018 largely revealed cervical and lumbar spine tenderness, moderately reduced range of motion, and occasional positive straight leg tests, the ALJ noted that Plaintiff routinely

presented with a steady and unassisted gait and ambulated without difficulty. He commented that records indicate that the epidural injections were largely successful in reducing pain and that Plaintiff had difficulty following through with medication refills, physical therapy referrals, and additional injections because of financial constraints. The ALJ observed that additional imaging in 2016 showed some slight changes from previous imaging, including a new small right paracentral disc protrusion at L3-4, a small central disc protrusion indenting the thecal sac, mild bilateral foraminal stenosis, and bilateral 1.5 pars defects at L5-S1, but examination was otherwise stable. R. 22.

The ALJ also noted that the medical evidence showed that Plaintiff was treated for an injury to her right upper extremity and that a June 2013 MRI revealed mild supraspinatus tendinosis, acromioclavicular arthrosis with os acromiale, trace fluid in the subacromial bursa, and early glenohumeral arthrosis but no full-thickness rotator cuff tear. He commented that Plaintiff underwent a nerve conduction and electromyographic study following the MRI, which revealed no evidence of an entrapment neuropathy affecting the median or ulnar nerve and no evidence of any significant brachial plexus disturbance or cervical radiculopathy. The ALJ stated that Plaintiff underwent conservative treatment for her right arm and shoulder pain, including prescription medications and trigger point injections, and that, after the last trigger point injection, Plaintiff reported excellent relief of 75 percent initially and 50 percent overall improvement at the follow-up exam several weeks later. Despite some relief from pain medications and trigger point injections, the ALJ noted that Plaintiff continued to have subjective complaints of right shoulder and arm pain in 2018. *Id.*

As to Plaintiff's mental health, the ALJ stated that Plaintiff was diagnosed with a mood disorder due to medical conditions with mixed features (anxiety and depression) and a pain

11

disorder with related psychological factors. He noted that she reported various mental health symptoms, including frustration, anger, and feelings of helplessness or hopelessness, and was referred to a mental health professional by her pain management doctor. The ALJ observed that, at a November 2016 mental health evaluation, Plaintiff exhibited good hygiene; was oriented to person, place, and time; had a cooperative attitude with motivation to participate in treatment; and displayed reliability as a good historian. The ALJ noted that her thought processes were intact, fund of knowledge was normal, and her judgment was intact. He found that, essentially, the assessment revealed that Plaintiff was having difficulty coping with her chronic pain and lack of support, and Plaintiff was recommended to participate in monthly mental health sessions and daily deep breathing exercises. The ALJ stated that, while Plaintiff testified at the hearing that she felt therapy would be beneficial, the financial aspect of the treatment would not allow for it at the time. The ALJ noted that there were no mental health treatment records beyond the November 2016 evaluation. *Id.* The ALJ thoroughly discussed the medical evidence and did not err in finding the objective medical evidence inconsistent with Plaintiff's complaints.

Plaintiff also asserts that the ALJ improperly rejected the statements of Plaintiff's husband and her friend. After summarizing the statements of Plaintiff's husband, Nicholas Simonet, and her friend, Louane Gabin, the ALJ gave their opinions little weight. As to Mr. Simonet's opinions, the ALJ concluded that the objective medical evidence does not support the limitations Mr. Simonet states Plaintiff's impairments cause. He also explained that he was unable to give any weight to Mr. Simonet's conclusory statements that Plaintiff is unable to work because the issue of whether an individual is disabled is reserved to the Commissioner. With respect to Ms. Gabin's opinions regarding Plaintiff's ability to engage in work activity, the ALJ found that the objective medical evidence is more informative about Plaintiff's limitations and work capacity. R. 27. The

ALJ considered the statements of Mr. Simonet and Ms. Gabin and properly weighed their evidentiary value along with the other evidence in the record. *See* 20 C.F.R. § 404.1529(c); *see also Elder v. Berryhill*, 774 F. App'x 980, 984 (7th Cir. 2019) ("[T]he ALJ permissibly discounted [third-party] statements because they were inconsistent with the objective medical evidence."). That is all that is required.

Plaintiff asserts that the ALJ did not properly consider her activities of daily living. She specifically notes that, while the ALJ indicated that she cooks, does laundry, and folds clothes on a daily basis with some assistance from her family, R. 21, the ALJ neglected to mention that she cooks "quick easy meals" for her family, takes all day to do a load of laundry, and only drives short distances. An ALJ is not required to discuss every piece of evidence in the record so long as he does not ignore entire lines of evidence contrary to his ruling. *Terry*, 580 F.3d at 477. Here, the ALJ mentioned that Plaintiff had difficulty with self-care activities and cooks and does laundry with assistance. R. 21. He also noted that "she walks about a mile, in increments, each day" and "is able to drive." *Id.* His description of her activities, while not as detailed as Plaintiff would like, was neither inaccurate nor misleading. The ALJ adequately discussed Plaintiff's activities of daily living and explained why the record, as a whole, supported his assessment of her capabilities. *See Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (noting that it is entirely permissible for an ALJ "to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated").

The fact that a reasonable factfinder could reach different conclusions based on the same evidence is not a reason to overturn the ALJ's credibility determination. Again, on judicial review, the court must only consider whether the ALJ's decision is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Biestek*, 139 S. Ct. at 1154. The ALJ's conclusion is supported by substantial evidence, is not patently wrong, and does not necessitate remand.

## C. Assessment of Opinion Evidence

Plaintiff argues that the ALJ erred in evaluating the opinions of her treating provider, Dr. Jeremy Scarlett. Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Burmester*, 920 F.3d at 512; 20 C.F.R. § 416.927(c). If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he must provide a "sound explanation for his decision to reject it." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Dr. Scarlett completed a physical medical opinion form on September 12, 2018. R. 834–38. He indicated that Plaintiff's symptoms included severe neck and low back pain, bilateral upper extremity pain, burning in the right upper extremity, weakness of the bilateral upper extremities, and severe insomnia secondary to pain. R. 834. He checked boxes indicating that Plaintiff had depression and anxiety secondary to her chronic pain. R. 835. Dr. Scarlett opined that Plaintiff can walk one to two city blocks without rest or severe pain, can sit for 30 minutes at one time

before needing to get up, can stand for 15 minutes at one time before needing to sit down, can sit less than two hours in an eight-hour workday, and can stand and walk for less than two hours in an eight-hour workday. He also noted that Plaintiff would need a job that permits shifting positions at will and walking around and that Plaintiff must walk every sixty minutes. He indicated that Plaintiff would need to take a thirty-minute unscheduled break every two hours. *Id.* Dr. Scarlett opined that Plaintiff would be able to occasionally lift less than ten pounds, occasionally twist and climb stairs, rarely stoop (bend), and never crouch/squat or climb ladders. R. 836. He opined that Plaintiff could use her hands to grasp, turn, and twist objects for 25% of an eight-hour workday, use her fingers for fine manipulations for 25% of an eight-hour workday, use her arms for reaching in front of her body for 25% of an eight-hour workday, and use her arms for reaching overhead for 10% of an eight-hour workday. *Id.* He indicated that Plaintiff would be off task 25% or more of a typical workday, that she is incapable of tolerating even "low stress" work, that Plaintiff has not been able to focus secondary to pain, and that Plaintiff would be absent more than four days per month. R. 837. He explained that Plaintiff has an inability to focus and stay on task secondary to the consistent distraction of her severe chronic pain. *Id.* Dr. Scarlett checked boxes indicating that he considered the longitudinal perspective, Plaintiff's complaints, the consistency of Plaintiff's complaints over time, Plaintiff's response to treatment, and the consistency of Plaintiff's complaints with a cervical MRI in reaching his conclusions. *Id.*

Dr. Scarlett also provided several work restriction notes to Plaintiff's employer from 2012 to 2015 as part of her workers' compensation claim and FMLA application. R. 699–700, 748–55, 769–76, 780–85. These statements contained similar findings and opinions as those contained in his September 2018 report. The ALJ gave Dr. Scarlett's opinions little weight.

The ALJ sufficiently articulated his reasons for giving Dr. Scarlett's opinions little weight. After summarizing Dr. Scarlett's opinions, the ALJ provided the following explanation for his decision:

> The majority of the documents he submitted were done for the purpose of work restrictions following an injury at work and were meant as temporary restrictions while she was treating (11F, 12F, 13F, 14F). Additionally, the letters and documents related to the workers compensation claim were completed in October 2013 (11F, 12F, 13F, 14F, 15F). These assessments are not consistent with the record and do not reflect any of the progress she made during treatment (2F/4, 90, 97, 109). The workers compensation documents also include conclusory statements that the claimant has a disability. The undersigned is unable to give those opinions any weight as the issue of whether an individual is disabled is reserved to the Commissioner (20 CFR 404.1527(d)). Finally, the treating source statement he submitted in September 2018 is inconsistent with the overall medical evidence, including his own treatment records (20F). The treatment records note that the claimant was functional on her medication regimen and showed improvement and pain relief after epidural injections and trigger point injections (2F/4, 21, 90, 97, 109).

R. 24.

Plaintiff argues that the ALJ cherry-picked references to Plaintiff's improvement without considering how limited the improvement was and without acknowledging the treatment notes that showed worsening. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. But an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations omitted). In this case, the ALJ's discussion of the medical evidence complied with the SSA's rulings and regulations. Although Plaintiff cites to instances in the medical record that she believes support Dr. Scarlett's opinions, it is not the Court's role to reinterpret the evidence. Instead, the Court must determine whether the ALJ's interpretation of the evidence was reasonable. *See Sanders*, 600 F. App'x at 470 ("The substantial-evidence

16

standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the record).").  The ALJ provided sensible grounds for giving little weight to Dr. Scarlett's opinions and provided "an accurate and logical bridge" between the evidence and his conclusions. *Roddy*, 705 F.3d at 636.

The ALJ instead gave significant weight to the opinions of the state agency consultants Dr. Mina Khorshidi from January 2017 and Dr. Sai Nimmagadda from July 2017 that Plaintiff is capable of performing sedentary work with frequent balancing, kneeling, crouching, and crawling; occasional stooping; and avoiding concentrated exposure to unprotected heights.  R. 23.  The ALJ explained that the state agency consultants did not account for the more recent records of Plaintiff's more recent symptoms and pain management treatment, specifically her continued complaints of back, neck, and bilateral arm pain.  He noted that, based on Plaintiff's degenerative disc disease and history of epidural injections, reduced range of motion, and tenderness, the RFC appropriately accommodates Plaintiff's symptoms and pain with a restriction of frequently climbing ramps and stairs, never climbing ladders, ropes, or scaffolds, and occasionally working with moving mechanical parts.  He also found that, with a combination of chronic back pain and pain, numbness, and tingling in her upper extremities (right worse than left), Plaintiff should not climb ladders, ropes, or scaffolds and should be limited to frequent reaching overhead, reaching, handling, fingering, and feeling with the left upper extremity, and occasional reaching overhead, reaching, handling, fingering, and feeling with the right upper extremity.  Therefore, the ALJ found that reducing Plaintiff to sedentary work with the additional restrictions in the RFC appropriately accommodates Plaintiff's continued treatment and chronic pain symptoms.  *Id.*  Plaintiff does not

17

challenge the weight given by the ALJ to the state agency consultants' opinions. In short, the ALJ did not err in his assessment of the medical opinion evidence.

## D. Obesity

Plaintiff also briefly argues that the ALJ erred by failing to identify her obesity as a severe impairment or address her obesity in making his determination, even though the state agency consultants found that it was a severe impairment. SSR 96-8p only requires that the ALJ "consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, 1996 WL 374184, at *5. Plaintiff has made no effort to show how consideration of her obesity would have changed the RFC or otherwise led to a finding of disability. "[T]he ALJ was entitled to presume that, had there been evidence that her obesity affected her functionality, counsel for [Plaintiff] would have presented it." *Hilmes v. Barnhart*, 118 F. App'x 56, 59 (7th Cir. 2004). Except for making a vague claim that "[o]besity could play a role in Ms. Simonet's disability," Pl.'s Br. at 21, Dkt. No. 22, Plaintiff presented nothing at the hearing and highlights nothing in the record that shows her obesity was disabling, alone or in combination with her other impairments. Without any allegations from Plaintiff or any source that her obesity created any limitations or restrictions upon her functional capacity, the ALJ was not required to create limitations of his own. In short, the ALJ did not err with respect to Plaintiff's obesity.

## E. Left Arm and Left Hand Impairments

Plaintiff asserts that substantial evidence does not support the ALJ's finding that she could frequently reach, handle, and finger with her left hand. The ALJ determined that Plaintiff could "frequently reach overhead with the left upper extremity, occasionally reach overhead with the right upper extremity, and all other reaching can be done frequently with the left and occasionally

with the right." R. 20. He also assessed that she could "handle, finger and feel frequently with the left hand" and do so "occasionally with the right hand." *Id.* Plaintiff contends that the ALJ erred in his assessment because he only considered the medical findings and not her statements about her limitations. But, as the Court has explained, the ALJ's credibility findings were reasonable. Plaintiff cites a physical therapy treatment record from March 2013 which found that she can only occasionally left hand simple grasp, left hand firm grasp, and left hand fine grasp. The ALJ noted in his decision that that assessment was inconsistent with other evidence in the record. R. 25. The ALJ cited to more recent examinations in the record finding that Plaintiff had full or near full strength in her left upper extremity, and he noted there was an absence of clinical, diagnostic, or other medical evidence in the record that the pain in her left arm and hand are severe. *See* R. 24. The ALJ built a logical bridge between the evidence and his conclusion. Consequently, his conclusion does not warrant remand.

### F. Persistence and Pace Limitations

Plaintiff claims that the ALJ failed to adequately account for her moderate limitations in concentration, persistence, and pace (CPP) in the RFC and hypothetical question. "It is well-established that both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Burmester*, 920 F.3d at 511 (internal quotation marks and citation omitted). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). The responsibility for assessing a claimant's RFC in a case that proceeds to a hearing lies with the ALJ. 20 C.F.R. § 404.1546(c).

In determining Plaintiff's RFC in this case, the ALJ gave the greatest weight to the opinion of state agency reviewing psychologist Dr. Beth Jennings. R. 25–26. Because the ALJ gave Dr.

19

Jennings' opinion "great weight," R. 26, the Court will look to her opinions to determine whether the ALJ properly assessed Plaintiff's mental RFC. Both state agency reviewing psychologists completed both a Psychiatric Review Technique (PRT) form, R. 97, 115, and a Mental Residual Functional Capacity Assessment (MRFC) form, R. 102, 123, to document their opinions based on their review of the record. The PRT is essentially a screening device the Agency uses to determine whether the claimant has a severe mental impairment that meets or is medically equal to one of the Listings that give rise to a presumption of disability. The evaluator assigns a rating to four broad functional areas, and those ratings determine whether the claimant has a severe mental impairment and whether it meets a Listing. 20 C.F.R. § 404.1529a. If the claimant's mental impairment is severe but does not meet a Listing, the evaluator must then complete the MRFC to provide a more specific assessment of the claimant's degree of mental functional impairment. The MRFC lists a series of questions intended to address the claimant's ability to perform various work activities. For each functional area, the reviewing psychologist is asked if the individual has any limitations. Follow-up questions then ask the reviewer to rate the individual's limitations as to various activities within that functional area. The Social Security Administration's Program Operations Manual (POMS) lists the ratings to be used and what they are intended to mean. The ratings are "not significantly limited," which means "the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity;" "moderately limited," which means "the individual's capacity to perform the activity is impaired;" and "markedly limited," which means "the individual cannot usefully perform or sustain the activity." The reviewer can also indicate that there is no allegation of a limitation or that the evidence is insufficient. When the activity is rated "moderately limited," the degree and extent of the capacity or limitation must be described in narrative format in another section of the MRFC. POMS DI

20

24510.063, SOCIAL SECURITY, *available at* https://secure.ssa.gov/apps10/poms.nsf/ lnx/0424510063 (last visited Sept. 29, 2021).

The ALJ noted that Dr. Jennings rated all four of the broad functional areas for Plaintiff as moderately limited in her March 2017 PRT. R. 26 (citing R. 98). Unfortunately, it is unclear whether the ALJ considered the more specific findings Dr. Jennings set forth in the MRFC she completed at the same time. Even if the ALJ had considered Dr. Jennings' MRFC, it would have added little, since she provides little help in understanding Plaintiff's functional limitations caused by her mental impairments. For example, in the narrative section of the MRFC, where the evaluator is asked to set out the claimant's "actual mental residual functional capacity" after rating her understanding and memory limitations, Dr. Jennings stated: "Clmt was able to answer two and three step questions on ADL's w/o assistance. Clmt was able to recall 3/3 items immediately on MSCE. Clmt has been AxO on exams." R. 102. This tells us nothing about whether Plaintiff has the understanding and memory needed to hold full-time employment. Likewise, in the narrative section following her ratings of Plaintiff's sustained concentration and persistence limitations, Dr. Jennings wrote: "Clmt has been AxO on exams. Clmt suffers from chronic pain. Clmt was able to spell 'world' forwards/backwards correctly, was able to do the alphabet, count down from 20 to 1. Clmt did has some diff. w/ trials of 3's. Clmt was able to have insight into her pain, set a goal for what she would like to be doing 5 years from now (seeing child graduate)." R. 103. Again, one is left with the same question: How does this relate to Plaintiff's ability to hold a job?

In the section of her report calling for additional explanation, Dr. Jennings essentially quoted sections of the consultative evaluative report submitted by Peter John Kores, Ed.D., following his evaluation of Plaintiff a month earlier in February 2017. Repeating Dr. Kores' findings, Dr. Jennings wrote: "It would appear there would be mild limitation in understanding

simple instructions but moderate limitation remembering these due to additionally [sic] anxiety factorys [sic] and marked limitation in carrying them out due to physiological factors." R. 105. Continuing with her additional explanation, Dr. Jennings wrote: "There would be marked limitation with concentration, attention and certainly work pace." *Id.* It is unclear from her report whether Dr. Jennings is endorsing Dr. Kores' findings or simply noting them. Regardless, her report does not support the ALJ's RFC determination.

The ALJ limited Plaintiff to "simple, routine and repetitive tasks," with "simple work-related decisions" and only frequent interactions with supervisors and occasional interactions with co-workers and members of the public. R. 20. If Dr. Jennings was endorsing Dr. Kores' findings that Plaintiff would have marked difficulties in carrying out even simple instructions and with concentration, attention, and pace, then her opinion completely undermines the ALJ's RFC determination. But even if she was not endorsing Dr. Kores' findings, the ALJ's RFC determination does not account for all of the limitations she found. In particular, there is no limitation corresponding to the moderate limitation that Dr. Jennings found in Plaintiff's ability to maintain pace in a work setting.

In light of Seventh Circuit caselaw, this was clearly error. The Court of Appeals for the Seventh Circuit has routinely criticized ALJs for including similar limitations in their RFC assessments and corresponding hypotheticals to account for moderate difficulties in CPP. *See, e.g.*, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("In most cases, however, employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."); *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (rejecting argument that ALJ's reference to simple work instructions and to routine, low-stress work reasonably accommodated

Moreno's moderate difficulties in concentration, persistence or pace); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015) (failure to define "fast paced production" was problematic); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) ("simple, routine tasks" did not account for limited ability to understand instructions); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) ("simple, routine" tasks did not adequately account for "impairment in concentration"); *Craft v. Astrue*, 539 F.3d 668, 677–78 (7th Cir. 2008) ("simple, unskilled work" does not account for difficulty with memory, concentration, or mood swings). At the same time, the court has consistently disclaimed any intent to mandate that ALJs use certain words or avoid others in order to account for such limitations. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2020) ("As a matter of form, the ALJ need not put the questions to the [vocational expert] in specific terms—there is no magic words requirement.").

Recently, the court provided an example of how an ALJ overcame these problems and properly accounted for moderate limitations in CPP. In *Martin v. Saul*, the court explained:

> Start with concentration. The second ALJ found that "[Martin] could maintain the concentration required to perform simple tasks, remember simple work-like procedures, and make simple work-related decisions." Moving to persistence, the ALJ, in defining and tailoring the RFC, further determined that Martin could stay on-task and thereby "meet production requirements." Of course, even if someone is on-task, it is still possible she may operate at such a slow pace that an employer would not find her work satisfactory. Hence, the second "P"—pace—must enter the equation. The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented. Ideally, the ALJ would have brought to the surface what is surely implicit in the determination—that any pace-based goals must be reasonable as a way of signaling that the employer could not set the bar beyond the person's functional reach.

950 F.3d 369, 374 (7th Cir. 2020). The ALJ's determination in this case fails to meet this standard. It fails to account for the limitations in pace that both state agency consultants and the ALJ explicitly found. The Commissioner's decision must therefore be reversed.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and **REMANDED** to the SSA pursuant to 42 U.S.C. § 405(g) (sentence four) for further proceedings consistent with this order.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 29th day of September, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge